**CERAMICA REGIOMONTANA, S.A., et al., Plaintiffs,**

**and**

**Internacional De Ceramica, Plaintiff-Intervenor,**

**v.**

**UNITED STATES, et al., Defendants,**

**and**

**Tile Council of America, Inc., Defendant-Intervenor.**

No. 84–3–00387.

United States Court of International Trade.

Decided May 29, 1986.

Brownstein Zeidman and Schomer (Irwin P. Altschuler, Steven P. Kersner, and David R. Amerine), Washington, D.C., for plaintiffs.

Wilkie Farr & Gallagher (Noel Hemmendinger, Walter J. Spak, and Jeffrey W. Carr), Washington, D.C., for plaintiff-intervenor.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch (A. David Lafer), Washington, D.C., for defendant.

Howrey & Simon (David C. Murchison, John F. Bruce, Kevin P. O'Rourke, and Rosemary Henry), Washington, D.C., for defendant-intervenor.

## MEMORANDUM OPINION AND ORDER

RE, Chief Judge:

Plaintiffs, Ceramica Regiomontana (Ceramica) and Industrias Intercontinental (Industrias), contest the final results of an administrative review by the International Trade Administration (ITA) of the Commerce Department of a countervailing duty order for ceramic tile from Mexico. 49 Fed.Reg. 9,919 (1984). The administrative review was conducted pursuant to section 751 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675 (1982). Plaintiffs are joined in their motion by plaintiff-intervenor Internacional De Ceramica (Interceramica).

Plaintiffs have moved for judgment upon the agency record, pursuant to Rule 56.1 of the Rules of this Court. Defendant, United States, opposes this motion, and urges that the ITA's determination be upheld. Defendant-intervenor, Tile Council of America, also opposes the plaintiffs' motion.

Plaintiffs contend that the methodology used by the ITA to calculate the countervailing duty rates was improper and not supported by substantial evidence. After reviewing the administrative record, the pleadings and contentions of the parties, and the supporting papers, this Court holds that the determination made by the ITA is supported by substantial evidence on the

record, and is in accordance with law. Consequently, plaintiffs' motion for judgment on the agency record is denied.

### Administrative Proceedings

On May 10, 1982, the ITA issued its *Final Affirmative Countervailing Duty Determination; Ceramic Tile from Mexico and Countervailing Duty Order,* with respect to imports of ceramic tile manufactured, produced and exported from Mexico. 47 Fed.Reg. 20,012 (1982). The ceramic tile covered in the investigation included non-mosaic, glazed and unglazed ceramic floor and wall tile classifiable under items 532.24 and 532.27 of the Tariff Schedules of the United States (TSUS). In this investigation, commenced in response to a petition filed by the defendant-intervenor Tile Council of America, the ITA determined that three programs implemented by the Mexican Government constituted countervailable subsidies. These programs are CEDI, FOMEX, and CEPROFI.

Pursuant to the first program, Certificado de Devolucion de Impuesto (CEDI), a certificate is issued by the government of Mexico in an amount equal to a percentage of the value of exported merchandise. The CEDI certificates may be used to pay a variety of federal tax liabilities, such as payroll taxes, value added taxes, federal income taxes, and import duties. From January 1, 1982 through August 25, 1982, the CEDI rate was 15 percent of the value of exports, and zero for the remainder of 1982 because the Mexican Government suspended the CEDI program for all exports on or after August 26, 1982.

The Fund for the Promotion of Exports of Mexican Manufactured Products (FOMEX) is the second program found by the ITA to constitute a countervailable subsidy. FOMEX is a trust fund established by the Mexican Treasury Department, with the Bank of Mexico acting as trustee. Through financial institutions, the Bank of Mexico makes FOMEX loans available at preferential rates to manufacturers and exporters for pre-export production and export financing.

Certificates of Fiscal Promotion (CEPROFI), the third program, are tax certificates which are used to promote the goals of the National Industrial Development Plan. These certificates are granted in conjunction with investments in designated industrial activities and geographic regions, and may be used to pay a wide range of federal tax liabilities.

Plaintiffs do not contend that these programs are not countervailable subsidies. Instead, plaintiffs object to the methodology employed by the ITA in calculating a single countervailing duty rate for all Mexican exporters of ceramic tile to the United States who received benefits under any of the three programs. Specifically, plaintiffs challenge the ITA's calculation of the country-wide duty rate attributable to CEDI benefits.

On January 18, 1983, the ITA notified the Mexican Government that it was conducting its periodic administrative review of the countervailing duty order on ceramic tile from Mexico, pursuant to section 751 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675(a). The ITA asked the Mexican government to complete a countervailing duty questionnaire pertaining to ceramic tile exports for 1982. The ITA requested information regarding the rate of CEDI benefits applicable to exports of ceramic tile in 1982. The ITA also requested a list of all firms that received CEDI benefits during 1982 and the amounts received by each firm. The ITA further requested a list of FOMEX loans and loan terms granted to ceramic tile firms during 1982. With respect to CEPROFI benefits, the ITA requested a listing of each ceramic tile firm receiving these benefits and the amount of benefit received in 1982. The ITA informed the Mexican government that firms that did not receive any subsidy benefits could avoid the countervailing duty deposit rate by applying for a zero deposit rate. To qualify for a zero deposit rate, firms were required to certify that they did not apply for or receive benefits under the CEDI, FOMEX or CEPROFI programs,

and would not apply for these benefits in the future.

The Mexican government responded to the ITA's questionnaire on March 14, 1983. The Mexican government stated that it did not maintain consistent statistics on ceramic tile exports because these products were grouped with others in its export records. Nevertheless, it attempted to compile the requested data. The Mexican government reported that 29 firms exported ceramic tile to the United States in 1982. According to the Mexican government, six of these firms received CEDI benefits. CEDI benefits were provided, the Mexican government stated, at a rate of 15 percent of the export value. The government requested that 15 of the 29 firms receive the zero duty deposit rate because they did not receive benefits under any countervailable program.

From April 26, 1983 through May 6, 1983, ITA personnel conducted a verification investigation in Mexico of the information provided by the Mexican government. These officials met with representatives of the Mexican government and with officials of various ceramic tile firms to verify the countervailing duty questionnaire responses. The Mexican government confirmed that the CEDI rate for 1982 had been increased from 10 percent to 15 percent in March 1982, retroactive to January 1, 1982. The government also confirmed that the CEDI benefit program was suspended on August 25, 1982, and did not apply to any shipments exported on or after August 26, 1982.

At verification, ITA officials reviewed the records of the two largest exporters of ceramic tile to the United States, plaintiffs Ceramica and Industrias. During review of Industrias, a significant discrepancy was discovered between the amount of CEDI benefits reported by the Mexican government and the figures kept by Industrias. Officials at Industrias informed the ITA that the correct CEDI figure for exports to the United States was much higher than the figure the Mexican government had originally reported. Industrias then provided the ITA with a revised amount of CEDI benefits the firm received in 1982. In June 1983 the Mexican government provided the ITA with revised figures on the CEDI benefits received by Industrias. The ITA, however, was not able to verify these figures as accurate. Also at verification, officials at both Ceramica and Industrias indicated that their firms took full advantage of the CEDI program.

The ITA issued the preliminary results of the administrative review on September 26, 1983. 48 Fed.Reg. 43,705 (1983). The ITA determined that ten firms met the zero duty certification requirements. The ITA also determined that the net total subsidy for 1982 under the CEDI program was equal to 10.27 percent *ad valorem*. 48 Fed.Reg. at 43,706. An internal ITA memorandum, dated July 14, 1983, explained the methodology used to arrive at the 10.27 percentage rate:

> CEDI. This is a subsidy available on all exports. The rate was 15% for exports from January 1—August 25, 1982. CEDI was suspended for all exports from Mexico on or after August 26, 1982. Rather than issuing two separate rates, I calculated a weighted average for the year. I took the IM 146 import statistics for January—August 1982 times 15 percent to get the theoretical maximum CEDI benefit for 1982, and divided that by the total IM 146 import figures for 1982 to get the weighted average of 10.-27 percent.

A.R. 443–44. The effect of the weighted average, therefore, was to reduce the 15 percent benefit to 10.27 percent to account for the termination of CEDI benefits, effective August 26, 1982.

The final results of the 1982 administrative review were published on March 16, 1984. 49 Fed.Reg. 9,919 (1984). The ITA basically used the same methodology it utilized in its preliminary determination, with two exceptions. First, the ITA eliminated data covering imports prior to February 23, 1982, to coincide with the period under review. Second, the ITA included data concerning advance CEDI benefits. In light of these adjustments, the ITA determined

that the total subsidy benefit under the CEDI program was 9.19 percent *ad valorem*, with a combined total under all the programs of 16.49 percent *ad valorem.* 49 Fed.Reg. at 9,920. The ITA also confirmed its preliminary determination that ten firms were eligible for a zero deposit rate. 49 Fed.Reg. at 9,920. In explaining its calculation of CEDI benefits, the ITA stated:

> [S]ince all firms received the maximum rate (15 percent) upon approval of their applications for individual shipments, we applied the maximum rate while providing for a certification process that would allow zero rates for firms not applying for or receiving any countervailable benefits. To calculate a weighted-average CEDI rate (reflecting suspension of the program in August 1982), we used U.S. import statistics since there were no consistently calculated figures from the Mexican Government which we could break down....

49 Fed.Reg. 9,919.

Plaintiffs filed the present action on March 22, 1984 in this Court, challenging the ITA's results of the administrative review. This Court is authorized to review determinations of the ITA which impose a countervailing duty on foreign exporters of products into the United States. 19 U.S.C. § 1516a(a)(2)(B) (West Supp.1985). In reviewing determinations of the ITA, this Court will hold such findings unlawful only when the conclusions reached by the ITA are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).

Plaintiffs contend that the methodology used by the ITA in reaching the countervailing duty assessment rate for the CEDI program is not in accordance with law, and not supported by substantial evidence. The question presented in this case is whether the ITA properly applied the standard 15 percent CEDI benefit, as adjusted by weighted average to account for termination of the program, in calculating a country-wide countervailing duty rate for the CEDI benefit program.

## Standard of Review

In reviewing a countervailing duty rate determination by the ITA, the standard of review is not *de novo.* Rather, it is the role and function of the Court of International Trade to determine whether the methodology used by the ITA is in accordance with law, and whether the ITA's conclusion is supported by substantial evidence on the record.

Pursuant to well established principles of administrative law, a reviewing court must accord due weight to an agency's interpretation of a statute that it administers. *See, e.g., United States v. City of Fulton,* — U.S. ——, 106 S.Ct. 1422, 1428, 89 L.Ed.2d 661 (1986); *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450–51, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *American Lamb Co. v. United States,* 785 F.2d 994, 1001 (Fed.Cir.1986). Thus, this Court will defer to the agency's interpretation of the statute, provided the interpretation is "sufficiently reasonable." *See, e.g., Federal Elec. Comm. v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981); *American Lamb Co. v. United States,* 785 F.2d 994, 1001 (Fed.Cir.1986). The extent or degree to which the Court should defer to the agency is dependent upon a number of factors. As the Supreme Court explained in a leading case,

> We consider that the rulings, interpretations and opinions of the [administrative official], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

The deference granted or extended to the agency's interpretation of its statutory mandate also applies to the methodology that the agency employs in fulfilling its lawfully delegated mission. *American Lamb Co.*, 785 F.2d at 1001; *Consumer Products Div., SCM Corp. v. Silver Reed America, Inc.*, 753 F.2d 1033, 1039 (Fed. Cir.1985); *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 928 (Fed.Cir. 1984). In order for the ITA effectively to administer the countervailing duty laws, it is necessary to permit some methodological flexibility. As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984); *Abbott v. Donovan*, 6 CIT 92, 570 F.Supp. 41, 46–47 (1983).

■ Of course, this Court will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *Board of Governors of the Federal Reserve System v. Dimension Financial Corp.*, —— U.S. ——, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986). As the Supreme Court has emphasized, "Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, *expertise*, the strength of modern government, can become a monster which rules with no practical limits on its discretion.'" *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 48, 103 S.Ct. 2856, 2869, 77 L.Ed.2d 443 (1983) (emphasis in original) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962) and *New York v.*

*United States*, 342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 663 (1951) (Douglas J., dissenting)). Indeed, it may be said that deference to an agency's interpretation represents a *judicial* determination that the agency's interpretation falls within the scope of the authority that has been properly delegated by the Congress. *See Montana v. Clark*, 749 F.2d 740, 745 (D.C.Cir. 1984), *cert. denied*, —— U.S. ——, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985). Thus, in reviewing a countervailing duty rate determination by the ITA, the court must ensure that the ITA's methodology is a reasonable means of assessing the net benefit received as a result of the illegal subsidy or grant. *See Industrial Fasteners Group, American Importers Ass'n v. United States*, 710 F.2d 1576, 1580–81 (Fed.Cir.1983).

The court must also ensure that the agency's conclusions are supported by substantial evidence on the record as a whole. Substantial evidence is something more than a "mere scintilla," and must be enough reasonably to support a conclusion. *Consolidated Edison Co. v. United States*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984); *Smith-Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed. Cir.1983).

### Verification

In this case, the ITA's verification trip to Mexico revealed that the Mexican government's response to the countervailing duty questionnaire was inaccurate as to both total exports and total CEDI benefits. The Mexican government's figure for total exports to the United States was approximately 25 percent less than what the U.S. import statistics revealed. Furthermore, the ITA discovered that plaintiff Industrias actually received benefits under the CEDI program almost 25 times the amount reported by the Mexican government.

Reviews under section 751 are conducted annually upon request, and must be completed within stringent deadlines. *See* 19

U.S.C. § 1675(a) (West Supp.1985). In conducting a review under section 751, the ITA is required to verify all information relied upon in its determination. *See* 19 U.S.C. § 1677e(a) (1982) (amended 1984). Hence, when the ITA requests information, it is vital that accurate information be provided promptly to allow the agency sufficient time for review. *See Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1560 (Fed.Cir.1984). When the ITA "is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its action ...." 19 U.S.C. § 1677e(a) (West Supp. 1985). Section 776(b) of the Tariff Act of 1930 provides:

> (b) **Determinations to be made on the best information available.**—In making their determinations under this subtitle, the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

19 U.S.C. § 1677e(b) (1982).

▮▮▮ In this case, the ITA determined that the statistics submitted by the Mexican government with respect to CEDI benefits did not provide an adequate basis accurately to assess benefits under this program. In an export market comprised of 29 firms, it would be impractical for the ITA to verify information pertaining to each individual firm. Thus, the ITA must sample representative firms. If the information received at the representative firms proves, as here, inaccurate in significant and material respects, it would be pointless to require that the ITA nevertheless use all information not proven incorrect. The Court will not require the ITA to use portions of the information received from the Mexican government and apply it to some firms, while relying on U.S. statistical figures for other firms in calculating the countervailing duty rate. Since the information supplied by the Mexican government was found, upon verification, to be inaccurate in important respects, the ITA was under no obligation to use it even though some of it had not been proven inaccurate. Thus, the ITA's decision to employ the standard 15 percent CEDI rate, in conjunction with U.S. import statistics, as the best information available was supported by substantial evidence, and in accordance with law.

### Calculation of Benefits

In calculating the subsidy benefits under the CEDI program, the ITA used the standard 15 percent rate because benefits were provided at that rate upon approval of the exporter's application. There is substantial evidence on the record to support the ITA's conclusion that the full 15 percent was granted to all importers who applied and conformed to certain minimal, technical requirements. Plaintiffs contend that the ITA has overstated the net benefit received under the CEDI program because some exporters of ceramic tile who did not qualify for the zero deposit rate did not apply for or receive CEDI benefits on all export shipments. Plaintiffs argue that the ITA should have calculated a national average CEDI benefit rate, rather than applying the 15 percent rate to all exporters who did not receive zero deposit status.

▮▮▮ To calculate a national average, the ITA would have to compare total value of CEDI benefits granted as reported by the Mexican government with the total exports to the United States to arrive at an average. This average would then be applied to all firms not eligible for zero duty deposit status. However, since the ITA was unable to verify the Mexican government's figure for total CEDI benefits, this proposed methodology would require the ITA to rely on unverified information in contravention of the statute. Instead, the ITA chose to use the full 15 percent of export value for CEDI benefits, adjusted to 9.19 percent to account for the program's cessation in August 1982.

In the absence of verified information, the Court cannot say that the ITA erred in

assuming maximum utilization of available benefits. The fact that some small ceramic tile firms, for reasons of convenience, or otherwise, did not always apply for CEDI benefits does not alter this conclusion. Indeed, the past administrative practice of the ITA has been to assume maximum utilization of countervailable programs where benefits were provided upon the fulfillment of certain ministerial or minimal requirements. *See, e.g., Ferroalloys from Spain,* 48 Fed.Reg. 4019, 4020 (1983); *Vitamin K from Spain,* 48 Fed.Reg. 40770, 40770–71 (1983); *Chains and Parts Thereof, of Iron or Steel from Spain,* 48 Fed.Reg. 37505, 37505 (1983). Moreover, both Ceramica and Industrias acknowledge taking full advantage of the CEDI benefit program.

There are limitations on the resources of the ITA which do not permit the agency to undertake a firm-by-firm review in order to establish and apply specific duty rates to every firm. These limitations include strict time constraints, budgetary restrictions, and the availability of qualified personnel. To require the ITA to analyze and investigate the books and records of every firm that disputes a countervailing subsidy deposit rate would, in effect, handicap or impede the agency by severely decreasing its ability to function effectively and efficiently. It is for these reasons that it is the general practice of the ITA to calculate a country-wide countervailing duty rate. A country-wide duty rate allows the ITA to establish one deposit rate for all exporters from a particular country, rather than attempting to determine the actual benefit received by each firm and setting separate rates. Country-wide rates are particularly useful where, as here, a large number of companies are involved. As the ITA stated in its final determination, "[w]e cannot possibly hope to conduct timely administrative reviews under section 751 unless we generally impose country-wide countervailing duty rates." 49 Fed.Reg. at 9,920.

It may be noted that Congress has endorsed the practice of publishing a country-wide countervailing duty rate by enacting a legislative presumption in favor of a country-wide rate. *See* Trade and Tariff Act of 1984, Pub.L. No. 98–573, § 607, 98 Stat. 2948, 3029 (codified at 19 U.S.C. § 1671e(a)(2) (West Supp.1985)). The legislative history of the Act indicates that:

> This provision is intended to lessen the administrative burden on the administrative authority stemming from implementing company-specific rates. The amendment continues to permit individual company rates for significant differences in benefits. The administering authority is expected to determine under what conditions company-specific rates are appropriate. . . .

H.R.Rep. No. 1156, 98th Cong., 2d Sess. 180, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5297. While courts are reluctant to attribute undue significance to the opinion of a later Congress as to a previously enacted statute, the unequivocal ratification of an established administrative practice is persuasive. *See, e.g., Bob Jones University v. United States,* 461 U.S. 574, 599–602, 103 S.Ct. 2017, 2032–34, 76 L.Ed.2d 157 (1983); *Haig v. Agee,* 453 U.S. 280, 300–01, 101 S.Ct. 2766, 2778–79, 69 L.Ed.2d 640 (1981); *Nissho-Iwai American Corp. v. United States,* 10 CIT ——, Slip Op. 86–27, at 14–16 (1986). In this case the establishment of a country-wide rate is clearly consistent with prior administrative practice, and well within the permissible scope of the agency's discretion. This Court finds that the ITA's utilization of a country-wide duty rate, which excluded firms that received no countervailable subsidies, was reasonable and proper.

It is noted that not all Mexican firms who did not qualify for zero deposit status received benefits under all three countervailable programs. For example, in 1982, Ceramica did not receive any FOMEX export loans and Industrias did not receive any benefits under the CEPROFI program. In calculating benefits under the FOMEX and CEPROFI programs, the ITA relied on information received by the Mexican government as to benefits actually dispensed under these programs. The ITA averaged the net benefits received among all firms receiving benefits, and included an

average for each program in the country-wide duty rate.

■ Plaintiffs do not contest these calculations, but argue that the ITA was inconsistent in averaging the Mexican government's figures for FOMEX and CEPROFI, while using a weighted average based on the standard benefit for CEDI.

The Court finds this argument without merit. The ITA's decision to rely on the government figures to calculate a net average benefit for CEPROFI and FOMEX was clearly based on a reasoned determination that the information pertaining to these programs was verified and reliable. On the other hand, it is equally clear that the ITA made a reasoned determination that the figures compiled by the Mexican government were not a sufficient basis from which to calculate an accurate national average for CEDI benefits. Thus, the ITA chose not to attempt to compile a national average of CEDI benefits received, but rather applied the 15 percent standard benefit as the basis for its calculations. On the record in this case, the Court cannot hold that this decision was not in accordance with law or unsupported by substantial evidence.

Plaintiffs' proposed national average would result in a downward adjustment of the 15 percent benefit available, and would provide plaintiffs, Ceramica and Industrias, with a windfall. By utilizing the 15 percent rate, the ITA has established a system which prevents the larger Mexican firms, who admit receiving maximum CEDI benefits, from paying a reduced countervailing duty rate because some smaller firms did not apply for subsidies. It is not the function of this court to formulate a specific methodology for an administrative agency,

but rather to ensure that the methodology used by the ITA is in accordance with law.

*Conclusion*

The evidence on the record indicates that all Mexican exporters of ceramic tile who applied timely for CEDI benefits received the maximum benefit of 15 percent. Since it was impossible to verify the total CEDI benefits dispensed by the Mexican government, the ITA assumed that those firms that received benefits received the full 15 percent. The agency established the zero duty deposit rate for firms that did not receive benefits under any of the Mexican subsidy programs. Any other method to obtain a more precise calculation of benefits to individual firms would have been both unduly burdensome and unverifiable. Moreover, the method proposed by the plaintiffs would have been much less precise, and would have resulted in a gross undervaluation of the benefits these plaintiffs received.

In view of the foregoing, this Court concludes that, under the circumstances, the ITA's methodology is reasonable, and is consistent with the purposes of the countervailing duty law to protect domestic producers from import competition which has benefited from illegal bounties or grants. In addition, the Court finds that substantial evidence on the record supports the agency's conclusion. Therefore, the determination of the ITA is affirmed, and plaintiffs' motion for judgment on the agency record is denied.